May it please the Court, Vincent Scali, Deputy Attorney General, appearing for the appellants in this matter. I'd like to reserve three minutes for rebuttal. And this morning I'd like to focus on three issues that this appeal presents. First, whether Title VII poses as a matter of law a liability on a prison employer for misconduct by prison inmates in the presence of correctional officers whose job it is to maintain control and discipline of prison inmates. Secondly, even if Title VII does impose liability on a prison employer for sexual harassment by prison inmates under a negligence theory, whether there is substantial evidence in this case that Correctional Officer Freitag suffered a hostile environment within the meaning of Title VII, and whether the prison failed to take reasonable steps to stop the harassment. And finally, I'd like to address the issue of whether there's substantial evidence that the individual appellants, Mr. Ayers, Ms. Schwartz, and Mr. Lopez, were substantially motivated by Correctional Officer Freitag's complaints about the inmate harassment and her supervisor's response to the inmate harassment to retaliate against her. Before you take those three issues and address them, may I ask you how is the injunction working? Is it causing problems? I notice that basically it implements plans that the State itself created. Is the injunction working well? I'm not sure I can say, Your Honor. I don't have personal knowledge of how it's working. But my general understanding is that the plan is being implemented, and it may be effective in reducing incidents of inmate indecent exposure. But that's outside the record, so I really can't say. No, I understand. Before you get into those three points, is the State's main problem with the injunction or with the damages? I think the main problem is with the damages, with the liability and with the damages. Are those going to be borne by the State, or some of them are going to be borne personally? They're borne by the State. That's correct. The punitive damages against the individuals might be borne. That's only $100 each. That's correct. That's right. But generally the damages will be borne by the State. But the State does have a problem with the injunctive relief, principally because this necessarily involves the Federal courts in, under the auspices of Title VII, in the administration of prison. And as you've got a lot of that these days. We have injunctions on the disabled, and the State made the same argument there. They didn't like the idea of Federal courts. But they said the injunction was working very well. And I noticed the whole State, the health administration in the State prisons, is now being done under a Federal court office order. And the State's very pleased with that order, it would appear. Well, at least the Governor said he was very pleased. And that may well be, Your Honor. But the injunctions, I believe, in those cases, are based on concerns of constitutional deprivations of the inmates. And in those cases, before issuing injunctive relief, the Court, I'm certain, applied the appropriate standard for determining whether or not. Well, the State didn't think so at the time. They appealed the injunction regarding the disabled prisons. But in any event, I understand nobody ever likes to be under an injunction, including the State. But when you have an injunction that's correcting a problem that I think everybody acknowledges existed, whether it's a Title VII violation or a 1983 violation or whatever, there was clearly a problem, and it's being addressed. And I just wonder whether the State would have any objection to, after the argument's all over, a day or two has passed, would there be any objection to attempting to meet with the other side, with our mediator, and seeing whether you might be able to work out these problems? Mr. Ron, I mean, with respect to the injunctive relief or the case itself? The whole case, whether there might be a way to resolve it in a way that would be mutually satisfactory. I'm certain that the Department of Corrections would be interested in resolving the issues in this case. But by the same token, I think the Department of Corrections, as any prison, has a strong interest in clarification as to whether or not it can be liable under Title VII for inmate misconduct. The Court should appreciate that this is a rather broad problem, broader than that in this case where there are allegations of sexual misconduct by the prison inmates impacting the correctional officers. Well, it's more than allegations. Well, it's certainly allegations. What I'm saying is the nature of the conduct concerns sexual harassment by inmates in the presence of correctional officers. And if prisons can be liable for harassment by prison inmates or the correctional officers, it goes, of course, far beyond harassment on the basis of sex. It would be harassment on the basis of gender, race, ethnicity, religion. And if Title VII imposes liability on a prison for failing to control the inmate conduct, harassment of prison guards, that means necessarily Title VII and the federal courts are going to be involved in every aspect of prison inmate security. I'm concerned you might very well prefer not to have a court of appeals decision on this subject. You might be better off settling the case and avoiding a decision that's not likely to go in your favor. Well, at a minimum, the Department of Corrections needs to know its responsibilities and legal obligations here. And whether we settle this case or not, it's clear that the lawsuits on this same theory of negligence are going to be pursued. They're being pursued even now. And as Judge Reinhart indicates there, there are two possibilities if this case goes to conclusion. One is this panel could affirm Judge Henderson and say that in this kind of circumstance, the department is responsible and has some duty to control the behavior of inmates. That's one possibility. The other possibility is that we might conclude that he was wrong in that determination. But right now, you have a district court judgment that says that. And I would assume in a mediation process, that could be an item of discussion, whether that remains in place. So. Well, we certainly appreciate that, Your Honor. It's just, I guess, our basic concern is that resolution of this case is not going to debar a myriad of future cases. No question about that. But it's kind of hard to imagine if the case pops up again that you wouldn't have better facts on the State side. I'm not prejudging this case in any way. I'm just saying this case has some unusual aspects to it that if you have to imagine the best possible case on behalf of the State to argue for the theory that there is no duty to control inmate behavior in a maximum security institution, I could certainly imagine better fact scenarios for the State. Well, in any event, you don't have much to lose by attending a mediation meeting, because the worst that can happen to you is you can say no. That's true. But you might see whether the mediator has any ideas that would solve both your problems. Well, I'll certainly convey that to the Department of Corrections, Your Honor. And if I might then, if I could focus then on the other two issues here. Again, assuming that there is a negligence theory of liability which imposes a duty on a prison to take prompt, reasonable steps to curb the harassment, it's plain that there's no substantial evidence that the Department of Corrections failed to take reasonable steps calculated to curb the harassment. Well, it's the Inspector General's report, isn't it? Well, the Inspector General's report, nor Mr. Katsaris's opinion, he was the plaintiff's expert, testified regarding, provided any evidence whatsoever as to whether or not the response of the Department of Corrections to Correctional Officer Freitag's reports of inmate indecent exposure. There's no evidence that the Department of Corrections failed to appropriately respond to her complaints, her 10 incidents of inmate indecent exposure. In fact, the undisputed evidence is to the contrary, that with respect to each of the 10 incidents of inmate indecent exposure, which occurred during the year that she worked in the Security Housing Unit within Pelican Bay State Prison, discipline was taken against those inmates. Weren't there some instances in which she made complaints and they wound up in the trash can? There is one incident in which there is some evidence that a report she filed, an incident report, was discarded. Undisputed, there is evidence of that. But that's in the context of the fact that in response to each of the incidents which she reported, again, it's her obligation as a correctional officer to witness this indecent exposure, write a report about it, and initiate disciplinary charges. And in those instances in which she did, the prison, through their due process administrative system, imposed discipline. And as to one of those inmates, he was referred to the local prosecutor for criminal prosecution. He was prosecuted, convicted. An initial six years were added to his sentence for the indecent exposure. Did the department ever consider transferring her out of the SHU? They offered her a transfer. In April 1999, Correctional Officer Freitag sent a letter to the director of the Department of Corrections, expressing her concern about the inmate indecent exposure and urging the department to invoke its policy of referring incidents of indecent exposure to the local prosecutor for criminal prosecution. In response, the director of the Department of Corrections called Correctional Officer Freitag at home. They had a number of conversations, and one of those conversations in May 1999, recognizing that she was unhappy working in the SHU, he offered her a transfer. Well, it was a transfer that was farther away from her family home. And the reason, as I understand the brief, that she wanted to work in the SHU was because it allowed her to go home at night and be with her four children instead of having to work night shifts. That's correct, Your Honor. She had her reasons for declining the offer of a transfer. She was offered a transfer. She was, indeed. And as this Court said in — May I ask you about the six-year sentence? Because I read that in your brief, but it wasn't clear to me that the six-year sentence was for an act of masturbation. Is that what it was for? I believe it was, yes. I believe it was based on a number of incidents of indecent exposure witnessed by other female correctional officers. That's my understanding, certainly, yes. It was for a — Is that Johnson or Jackson? That is Johnson. And is Jackson out now? I don't know if Jackson's out or not, Your Honor. I don't know. But, again, focusing on whether the Department did take prompt, effective, corrective action, they did offer a transfer. And this Court, in the recent Galdamez decision, implied that offering a victim of harassment a transfer is a reasonable, appropriate step. In addition, as is clear, the Department initiated discipline against the inmates that Correctional Officer Freitag reported as having engaged in indecent exposure. And their sentences were enhanced. They lost good time credits. And one of them, Inmate Johnson, was convicted and six years were added to his sentence. A plaintiff's own expert testified that imposing discipline for indecent exposure and referring for criminal prosecution, which is what occurred here in response to Freitag's incidents, are reasonable steps. There's no dispute that then the Department took steps reasonably calculated to curb the harassment. If they offered her a transfer at the very outset of this and initiated discipline and did discipline the inmates involved and did refer them for criminal prosecution, plainly it's undisputed that the prison did take steps reasonably calculated. I wouldn't address the retaliation claims. You could do all that, assuming that you did take steps and then at the same time retaliate against the person who made the complaints. In theory, that's certainly possible. But it's plain there's no substantial evidence that Warden Ayers was motivated by her complaints to terminate her. The Correctional Officer Freitag aptly has failed to identify any evidence whatsoever that shows that Warden Ayers was motivated by those complaints some 14 months before her termination. No evidence whatsoever. And there's substantial evidence that Warden Ayers was motivated by the findings of three separate independent investigations of Correctional Officer Freitag, which concluded that Correctional Officer Freitag on three separate occasions filed false police reports about fellow correctional officers. That was Warden Ayers' motivation, not the letters she wrote in April of 1999. And there's no evidence demonstrating that Warden Ayers did not nor should not have reasonably relied on these three separate reports of investigations concluding that she was dishonest and that there was a pattern of dishonesty here. The only evidence that they've identified in the record is after the Correctional Officer Freitag wrote her letters complaining about the inmate and decent exposure, after that adverse things happened to her. And 14 months after she wrote those letters, she was terminated. There's no evidence whatsoever to rebut the conclusion that Warden Ayers was motivated by these three separate independent reports of investigation showing she was dishonest. And furthermore, the insubstantiality of that evidence and the weakness of that finding of retaliation by Warden Ayers is substantially undercut by the admission of the prejudicial admission of evidence of other personnel actions against Warden Ayers ostensibly to show his retaliatory intent when it's plain that Warden Ayers had nothing whatsoever to do with those other adverse employment actions against other correctional officers. That evidence was inadmissible and was erroneously admitted. And given the insubstantiality of the case of retaliatory motive against Warden Ayers, it's plain that judgment has to be reversed. Thank you. We'll give you your three minutes to rebuttal. Thank you, Your Honor. Okay. Good morning, Your Honors. I'm Pamela Price of Price & Associates, appearing on behalf of Plaintiff Deanna Freitag. In this appeal, would you address counsel's statements that every time your client filed a complaint about the existence of masturbation, that disciplinary action was taken against the offender? Yes, Your Honor. That is not the record in this case at all. With respect to inmate Jackson, who was the initial inmate that my client encountered who threatened to kill her in September of 1998, that incident did not result in disciplinary action being taken against inmate Jackson. And following that, there were a series of incidents where inmate Jackson, where Officer Freitag found that her 115s were not enforced due to the loss of time constraints, the department's failure to follow through. The record was very clear that throughout the period of time that not only Officer Freitag but other female officers complained about inmate Jackson, he was never referred for criminal prosecution. In fact, the record was clear that Officer Freitag was referred when inmate Jackson was not, and that was done by warden Ayers. With respect to inmate Johnson, counsel has made a misstatement of the record regarding his prosecution. He was prosecuted based upon the complaints of Officer Don Melton. He was never prosecuted based upon any complaints by Officer Freitag. Now, the complaints for which he was prosecuted, were they for the masturbation? Yes. There were numerous instances of masturbation directed toward Officer Melton. However, the response to Officer Freitag's complaints, as well as the complaints of the other officers and the evidence, was overwhelming, that they were told that they should get over it, that this was a man's job and that they were doing a man's job, and therefore they had to deal with it, that they were not, their complaints were not going to be taken seriously. How many complaints did your client file on this subject? We were able to document that she, they did have approximately 11 115s. However, Your Honor, there are numerous, there was testimony throughout that the women would write this information in the logbooks and that there were times when 115s were not written because they were deemed to be futile. And your client filed 11? Yes. And at least at one of them, Your Honor, where, which was one of the most egregious instances by Defendant Swartz where it was the initial one where the inmate threatened to kill my client, Defendant Swartz reduced that 115 from a Category B, I believe, to a Category F with no explanation whatsoever. The thing that strikes me about this is it would seem to me that, looking at this from the outside, that there are really only two ways to resolve a situation like that. This is the special handling unit within a maximum security prison. It's difficult, if not impossible, to take the inmate out and put them in a different type of custody because this is at the top of the custody tier, as I understand it. So the other option would seem to be to remove Ms. Freitag from this very difficult situation and provide her employment at the same pay grade, et cetera, in some other aspect of the department. And is it correct that she was offered that and refused it? She was offered a transfer to another institution. She was not ever offered a transfer to another position within the institution. She was reassigned involuntarily after she complained. Were there positions at Pelican Bay that would not have involved a diminution in pay grade, et cetera, that didn't involve contact with the inmates in the SHU? Yes, Your Honor. And eventually, toward the end of her employment, she just threw the bid in post, yes. But I think the concern that we would have, Your Honor, with that is twofold. One is that if that becomes the remedy, then essentially you are saying that no female, any female who is offended by this type of behavior is not – will not have an opportunity to work in the SHU. The second – and that's obvious discrimination on its face. The second part of that, Your Honor, is that the fact that you cannot remove the inmate from the SHU does not mean that you therefore relinquish all control over the situation. The defense has brought up this – Other things that could be done. A number of other things that could be done. And Ken Katsaris testified to that. The OIG, you know, enumerated a number of options. The purpose of the institution is to control the inmate. And the concern that Officer Freetag had was that if you do not control this behavior, if you do not address this behavior while you have this inmate in this institution, at some point you're going to release this inmate on the public. And she said, I will not stand by and allow that. Well, they're not going to be released on the public. There are a lot of LWOP prisoners there. And one of the problems with a life without parole prisoners is there's not much you can do to discipline them. That was true with an inmate called Double Life Taylor, Your Honor. But Inmate Jackson had a release date. Inmate Johnson had a release date. So some of the – One of them didn't, I thought. They both have – Yeah. Both of them have release dates. Taylor did not have a release date. Inmate Wheeler did not have a release date, I don't believe. But Johnson and Jackson had a release date. And Jackson had a fairly, you know, approximate release date. And that's the thing that motivated her to say, we've got to deal with this problem. The department has asserted that they don't have control. And that obviously is a very frightening prospect for all of us who assume that when you put an inmate in the most secure of secure institutions that the institution is going to be able to exercise control over that inmate. They have to – Well, I'm not sure that's a reasonable assumption. Not only there, but I mean, look at the jails in Los Angeles and the fact that they've now instituted segregation policies because they can't control the inmates. Well, it's difficult, but you have to make the effort. And that was the essence in this case, was that the department did not see this as a problem, that they did not consider it a problem primarily because it was something that impacted the female officers. And yet the officers, as Ken Casares pointed out, if it were something different, if the inmates were screaming all the time, if they were engaging in some other kind of misbehavior, the institution would take appropriate action to address that. It is not appropriate for the institution to ignore this behavior simply because it involves sexual harassment of female officers. That's true, if that's all that was being ignored. There certainly is a general view that the prisons have been run by the inmates, not the guards, in California in recent years. Would you disagree with that view? Well, I would somewhat disagree with that, because I do think that the inmates, it is, there's no question that it's difficult to control the inmates, but I do think that the departments of corrections, the budget for this institution was $83 million. I find it hard to believe with that much money on an annual budget for one institution that you're not in control, that you don't have the capacity to control what's going on there. And the fact is they determine when the inmates eat, they determine when the inmates shower. Reports on Pelican Bay and the other cases Judge Henderson has had have been quite remarkable. I mean, what's gone on there is, you know, sexual harassment is just a part of it. Yes, Your Honor. It's not that they're discriminating and not solving sexual harassment problems. They've had overwhelming problems at the institution. This is true, Your Honor, and it's, you know, a problem that Judge Henderson, unfortunately, is having to deal with over and over again. Tell me, how long after the last complaint was the discharge? Would have been about her first discharge, and I want the record to reflect. There were two discharges. The first one was in March of 2000. So that would have been approximately six months after her last complaint, approximately September of 99, I believe was the last one. What happened to that discharge? It was rescinded by the institution because apparently they didn't follow due process. She was walked off the institution in April of 2000. When they terminate you, they come, they get you, they walk you off in full view of everybody. So she was subjected to that in June of 2000. She received a call at home, told her come back to work, no explanation whatsoever. And then in June of 2000, they served her with the same notice of adverse action, and then she was not allowed to return. And you say that was the first discharge was six months after the last complaint? Yes, Your Honor, approximately. Approximately seven months. All right. Anything further? Yes, Your Honor. I do want to address briefly the position of the department that Title VII cannot apply to this institution. There's absolutely no support for that in the law, and there's no basis to find that prisons as institutions are somehow exempt from Title VII. This Court would be establishing a new doctrine, a brand-new approach to the regulation of prisons as well as to the implementation of Title VII. And as the Court is well aware, as a remedial statute, Title VII is to be interpreted broadly. And so the suggestion as well that there's the deference that is normally afforded to correctional institutions should somehow preclude the application of Title VII in this case and to this one. Do you agree that that deference is appropriate in Title VII cases? I agree that the deference should be considered, could be considered under certain circumstances. I don't think that it's totally precluded in Title VII cases. I do think in this case it was not presented to the jury or raised at the lower level. So there's no evidence in the record of that there was a decision that would normally be entitled to deference. That simply was not a defense in this case. It is something that has come up on appeal, but it wasn't litigated either in the pleadings or in the facts of the case. It was not a defense at trial. And if it had been, we would have addressed it. And I'm certain, given the testimony that we did present, that we would have been able to defeat that kind of a defense. The other novel position is the requisite control defense. And their suggestion that that issue has not been addressed in cases is partially true. But, in fact, if you look at the Turnbull case, which is cited by our amicus, as well as the Crist case, those cases talk about look at the employer's control over the environment at large. So it's not simply the employer's ability to move or remove someone from the environment. You have to look at the entire situation and the degree of the employer's control. So that issue has been addressed in those cases. It has not been addressed in the cases that the defendants cited. We do assert that there is substantial evidence to support not only the jury's finding on retaliation. Certainly, there was every evidence of retaliation on the part of these defendants. Officer Freetag became a target when she complained. And to suggest that there was this 14 or I think they characterized it as a 14-month lapse between the time she complained, she was under investigation that entire period. The first action that was taken against her immediately was to refer her for a fitness for duty evaluation. That was in April of 1999, when the psychologist deemed that she was not crazy and she was fit for duty. The first adverse action was initiated in June of 99. So from June of 99 to March of 2000, they were essentially setting her up to be terminated. And they were successful in that. And the jury agreed with us that that was their intent, that that was their motivation. And the jury's finding, there's no dispute about the jury instructions in this case. The jury's findings under the Seventh Amendment are binding. We have a verdict. We have a judgment. And that judgment says that Officer Freetag was the victim of retaliation by not only the department, but by defendants Ayers, Swartz, and Lopez. I wanted to ask you about Lopez. As far as I can see, Lopez tore up the notes of his investigation. What else did he do? He wrote a report that suggested that Officer Freetag was dishonest, that she was a dishonorable officer. He basically tried to present her as being the problem, instead of presenting the objective facts or doing any kind of investigation that might have addressed the issue. As the long-term EEOC officer for this institution, his duty upon inquiry in responding to that charge was to look at the facts, to look at the problem. And if he had taken a fair and impartial look, if he had taken any kind of look, he would have seen that there was a problem. He knew that there was a problem, and yet he turned around and tried to present her as being totally dishonest and tried to cover up what actions were being taken, even as he was writing this report, to retaliate against her. That was reckless disregard for her constitutional rights, and it was intentional conduct. So you're focusing on his report as the chief act that he... I think his report, his refusal to entertain the complaints of the female officers over a period of time, including Officer Freetag, as well as obviously his state of mind, his comment to the Inspector General. When the Inspector General's office came to Pelican Bay to investigate this problem, they looked to Augie Lopez. They worked out of his office. They looked to him to tell them what is going on, to guide them and assist them in their investigation. Instead, he tries to mislead them, and ultimately, off the record, he makes this ridiculous comment to Deputy Inspector General Richard Ramsdale, that the only reason they're complaining is because they're a bunch of lesbians. That tells us what his motivation was and what his effort was to try to minimize and mislead the office. And that was certainly to undermine and in violation of Officer Freetag's constitutional rights. The Court... I assume you would not have any objection to attending a mediation session? No, Your Honor, and my understanding is that that was not an option. If the Department is prepared to reconsider its position, Mr. Scali and I have discussed that. We have a very competent staff here and a top-flight mediator, and we've solved remarkable problems. We even solved a death penalty case in mediation. So if that could be solved in mediation, probably anything can be. You have nothing to lose by that. No, I have worked with this Court's mediation. We settled a very difficult case last year, and we had an excellent experience through the program. Who is the mediator on that one? Roxanne Ash, Your Honor. Excellent. And a very difficult case where there was no thought that it would ever be settled. The Court... So certainly, we're willing to do that. We do think that the injunctive relief ordered by Judge Henderson was appropriate, and I can represent to you the fact that it was not. As an officer of the Court and as someone who has participated in the development of that program, that the Department is very proud of the program. The program, by their report, is in fact working. And certainly, we think that it would be a terrible irony for us to have gotten that far, for the Department to have gone from ignoring a problem to now conquering a problem, to have that program set aside because of our inability to prevail on this appeal. Pelican Bay has gone from ignoring the problem and trivializing it and claiming that they didn't have a problem to addressing it. With a little encouragement from a Federal judge, the problem became plain, and the problem is being conquered. Deanna Freetag paid a terrible price for that result, and it's way past time, Your Honor, for her to be paid in this matter. She walked out of Pelican Bay in April of 2000, she was walked off again in June of 2000, the verdict was rendered in April of 2003. I stand before you in 2006 saying it is time for justice to be done on behalf of my client, Deanna Freetag. Thank you very much. First, it's clear that under Title VII, this standard of deference to prison practices and policies does apply. And it's not a matter of defense in a Title VII negligence theory of liability for non-employee harassment. It's wholly inconsistent with that theory of liability. And the suggestion that the defense might have proposed an instruction or a defense based on the notion that the courts and the trier of fact are to give deference to the prison's practices and policies with respect to inmate discipline and security, it simply flies in the face of the theory of liability. Under the deferential standard, the prison's policies and practices with respect to inmate security, including responses to inmate indecent exposure, are to be affirmed, sustained, if there's a reasonable relationship to a penological interest. However, under Title VII, under a negligence theory of liability, the employer can be liable if it fails to take all reasonable steps, take reasonable steps to stop the harassment. Those are wholly inconsistent. You don't think they can be reconciled? They cannot be reconciled. I mean, you couldn't have a different standard of the obligation of a prison under Title VII as opposed to that of an ordinary employer, where you would say that a prison can't stand by and tolerate and acquiesce in discrimination, but it doesn't have to be held to the same standard as an ordinary employer. It can, if it takes, you know, adopts a position that this is the best we can do, given the penological concerns, that you might do difference to that, but it's not home free from just ignoring violations of Title VII. Well, we still think that that's unworkable in this context. Under the negligence theory, the employer can be liable if it fails to take reasonable steps calculated to end the harassment. But you might defer to what the prison's judgment is as to reasonable steps, if it's based on penological concerns. They may not be the same reasonable steps that you would demand of general motives, if there's still a general motive. Well, I think based on a trial record, that'd be an unworkable standard, again, to the detriment of the prison employer. Let me ask you another question, because we're running out of time. We haven't discussed much the 1983 action. Do you dispute the idea that complaints regarding a practice of sexual harassment in a prison is a matter of subject of public concern? We do disagree, Your Honor, yes. What would be a subject of public concern in a prison? The prison conditions are intolerable. Would that be a matter of public concern for the prisoners? Arguably, that might be. But not for the guards? Well, specifically what the complaint was, was that the inmates are engaging in criminal misconduct, indecent exposure, and the department, Pelican Bay State Prison, should take additional steps to stop that harassment. That's simply a complaint about the... Well, let me put it slightly differently and say there is a practice in the prison of harassing the guards sexually by the inmates, and the prison authorities are disregarding that conduct and not... I'm not saying this is true. I'm saying that's a complaint. The prison authorities are ignoring that conduct and allowing the guards to be subjected to this without taking any action. Would that not be a matter of public concern? Again, we think not, because, again, it's simply... We don't have any examples of such a complaint that it's simply an expression of concern about how the prison is being run on a day-to-day basis. And that's not a matter of public concern if the prison's being maladministered and it's being run in a way that's dangerous to the prisoners or dangerous to the guards? That's not a matter of public concern to the prisoners? That could be a matter of public concern, but, again, what we have here is a complaint about how the certain prison practices were being administered. It's purely job-related. The correctional officer who's charged with investigating, reporting incidents of indecent exposure, that's part of her job, is complaining that this is occurring, that inmates are, in fact, engaging in misconduct, and the supervisors aren't taking... They're saying there's a practice of sexual harassment in the prison. That's how they characterize this indecent exposure by the prisoners to harass the guards. The claim is of sexual harassment. It's a Title VII claim. Correct. And if the claim is that there is this practice of sexual harassment and the prison is ignoring it, you know, assume it's totally untruthful. But if that's the claim, isn't that a subject of public concern? That could be a subject of public concern. I agree with that. Isn't that what this is about? It is not what this is about. First of all... Isn't that what the case is about? No. Specifically, the complaint was inmate indecent exposure is occurring, and there are additional steps that could be taken, in fact, steps within the Department's policy for responding to indecent exposure. Again, it's a distortion of the record to suggest that plaintiff's theory of the case or the facts show that the Department was ignoring... I'm not saying the facts show that they were. And that wasn't the allegation, either. The allegation was not that the inmate sexual harassment is occurring and the Department is doing nothing about it. That was not even the complaint. The complaint was indecent exposure is occurring, and we urge the Department to get tough with these inmates and refer them for criminal prosecution. There was no allegation that sexual harassment is occurring and the Department is ignoring it. No allegation of that. No evidence of that. And what plainer evidence refutes the fact, the assertion that nothing is being done about it or the Department is ignoring it in that the — when Officer Freitag filed disciplinary reports in July... It doesn't matter whether it's not — whether it's unfounded. You're trying — what you're saying is it's not true. But that's not the question, whether it's justified. The question is, is it a complaint of public concern? And I'm saying no because the complaint, the allegation within her memos was not that sexual harassment occurring and nothing is being done about it, the Department is ignoring it. That was not the allegation. The allegation was indecent exposure is occurring, and she urged the Department to refer, consistent with the Department's policy, for criminal prosecution. There was never an allegation in this case that this is occurring and the Department is ignoring it. And the facts plainly refute that because when — all right. All right. I don't know how much time I have at this point. We'll give you another minute. All right. Another minute. With respect to whether there's substantial evidence that the Department took steps reasonably calculated to end the harassment, in this case, the undisputed evidence is they did. And I want to clarify. If I misspoke and said that each time that Officer Freitag filed a report of inmate indecent exposure that, in fact, those inmates were disciplined, no. There are, in the record, a number of occasions, three times when she filed a report and the inmates were disciplined. The state of the record as to the others is there's no evidence that they weren't disciplined. And, again, it's Freitag's burden to show that the Department failed to take corrective action, failed to discipline the inmates, and there's no evidence that they didn't. And, again, to clarify the burden here, the plaintiff has the burden to show that the Department failed to take steps reasonably calculated to end the harassment. And here, plainly, the Department did. They disciplined the inmates. They referred for criminal prosecution. The burden, the defense, the employer, is not liable if it fails to take all reasonable steps to curb the harassment. That's not the burden for their defense. And the suggestion here that there are additional measures which the Department could have taken and perhaps are now taking pursuant to the injunctive relief doesn't demonstrate that the Department failed to take reasonable steps to curb the harassment. They're not required to stop the harassment, nor are they required to take all steps reasonably calculated to end the harassment, but to take steps reasonably calculated to end the harassment. And they did that. And the undisputed evidence is they did that. Thank you, counsel. Thank you, Your Honor. The case just argued will be submitted. The final case for oral argument is read.
judges: Reinhardt, Noonan, Hawkins